Good morning, everyone. The first case is Renfro and Lustig v. Unisys. Mr. Wolfe? Thank you, Your Honor. If I may, I would like to reserve four minutes for rebuttal. Thank you. Michael Wolfe, I'm the attorney for the plaintiff's appellants. May it please the court. The plaintiff's plausibly alleged that defendants breached their fiduciary duties under ERISA by selecting almost exclusively retail mutual funds as the investment options in this plan, also without considering any institutional alternatives, also by failing to obtain any additional services to offset the retail level fees. Let me ask you this. Should we employ the same analytical approach as Hecker and Braden? We look at the menu of options here. We should not, Your Honor. And here's the problem with that analysis. To just say offering a variety of mutual funds and a range of fees leads to the very problem that we point out in this case. The lowest fee option is the Fidelity Spartan funds, as defendants point out. That's what, about 10 basis points? Yes, Your Honor. Yet the defendants selected the more expensive share class of that investment option, that mutual fund. Is that alleged in the complaint? No, Your Honor, that's not alleged in the complaint because the broader issue in the complaint is not just share classes of mutual funds, but the entire market generally. Because for the same reason that it is imprudent to select the more expensive share class of a single mutual fund, it's imprudent to select the more expensive investment vehicle for the investment type. A multibillion dollar investor has access to an investment market that's far wider than individuals with a few thousand dollars to invest in the retail market. You're not arguing about that they don't have enough choices in terms of the kinds of mutual funds. I mean, you have some value funds, some growth funds, some index funds, some... Commingled funds. You know, commingled funds. You have some large cap, mid cap, small cap, et cetera. It sounds like you're talking about they could have gotten a better deal on costs? Yes, in terms of the investment vehicle. So if they decide to have, say, seven different classes of investments, why only look at retail mutual funds? Why not look also at commingled accounts, which are available to a multibillion dollar plan? Why not negotiate specifically with an investment? There were some commingled funds here, were there not? There were. There were four. In bonds and one S&P 500 index fund. But how about the other areas? Because those types of investment vehicles are available in each of these different categories. And the thing is, is that when you have a billion dollars put into an investment, you can negotiate a fee rate that declines much more rapidly and is on a much more favorable declining schedule than you get... Don't you have to look at other factors beyond what the fee is? Don't you have to compare performance of the funds, too? Absolutely, Your Honor. I completely agree. But would you agree that you have to at least look at that? Our allegations in this case are that the defendants didn't look at that. They have 64 mutual funds here. The question is, did they engage in a prudent process in every single one of those 64 options and decide that the retail mutual fund was the best investment vehicle for that option? Indeed, in each of the 71 investment options in this plan, all of them, they selected the investment option of a single company. Can we believe that the defendants went through a prudent process for every single investment option and decided one company's offering was the best in each of those categories? But what normally happens here is if you're an employer, you're looking for someone like a Fidelity, like a Vanguard, like a Legg Mason that gives you a lot of options. Fidelity gives about as many options as anyone. I keep coming back. It sounds like what you're saying is Unisys should have negotiated beforehand more of an institutional rate rather than a retail rate for these particular funds. I don't get you arguing that these funds are bad choices in terms of the investment performance. Correct, Your Honor. It's not that they invested unwisely or unprofessionally. Fidelity's got a, you know, people invest in Fidelity because it's got a good name. I mean, it became famous in the 80s for the Magellan Fund. Right, and Fidelity spends a lot of money on advertising to make sure that it's well-known. The thing is that for the $1,000 investor, all you have is retail mutual funds. For a billion-dollar investor, you have a lot better than that. You can find specific investment advisors who will provide the same investment management, but on much better terms. In addition, even with retail mutual funds, other plans obtain rebates from Fidelity to get back for the plan the excessive portion of the retail mutual fund. Yeah, their plans are paying rebates, but my recollection is only one, and it's Texas Saver Plan. Well, that's a specific example that we brought up, but we know that in the prospectus they state some amount, undisclosed amount, is reserved for record-keeping compensation. We know that the defendants here negotiated for record-keeping at $150,000 a year, and we can surmise from what that record-keeping compensation rate is that Fidelity got $6 million when they contracted for $150,000. Now, does that prove our case? Not necessarily, but it at least shows that it is plausible that the defendants did not act diligently in this case, that they were not out looking for the most reasonable expenses for a plan of this size. Again, it's not just whether this is what other individual $1,000 investors can get. It's whether the fiduciaries of this plan acting loyally went out and used that bargaining power of $2 billion to get reasonable rates for this kind of expense. Someone objected here. They could, in effect, have a mini opt-out by participating in an index fund or one of the other types of the few funds that were available. Well, there's only one index fund, and that's in the S&P 500. The others are bond funds. And the question is, well, if I want to be invested in – The typical index fund is an S&P 500 fund. That's true, Your Honor, but there's also the Russell 1000. There's an index fund for just about every type of investment option. And possibly if you have that variety, then that may solve the problem. Possibly you have a brokerage window that may solve the problem. But that's not here. Any other questions? We'll have you back. Thank you very much. Ms. Betz? Good morning. Good morning. Louise Betz. I represent the Secretary of Labor. May it please the Court. This case is about whether 401k plan fiduciaries can escape liability for selecting imprudent investment options for the plan simply because participants may choose from among those options. Essentially what I understand you're saying, let's say all the options were bad. You can't hide under 404. Is that correct? Absolutely. That's correct. But if a lot of the options were good, then you could use it as a shield? No. 404c only immunizes fiduciaries from liability for losses that result from participants' exercise of control. Under the Secretary's interpretation of section 404c. And that's what I'm trying to get. When is it that you cross the line that, in effect, you have denied participants control? The question whether there's a sufficient range of investment options under the 404c regulations essentially establishes that fiduciaries are entitled to the safe harbor only for losses that result from participants' exercise of control over those options. Okay. We have 70-some plans. Let's assume that it's proven that, for some reason, 50 of them are not good. I mean, there's a real problem. But about 21 of them or 20 of them or thereabouts are okay. Are you able to, under your 404c analysis, are you allowed the shield then in that instance? No. Fiduciaries are liable for their imprudent selection of any investment option in the plan. Oh, any? So you have 71 and one is a bad investment option and participants select that option. And they don't have the ability or the fiduciary does not have the 404c defense? That's right, because the loss in that case does not result from the participants' exercise of control. And this is because of your regulation, not because of the reading of the statute? It's because of both. The Secretary's regulation logically interprets the statute as immunizing fiduciaries from liability, only to the extent that control over that liability has shifted from fiduciaries to participants. So we would have to reverse ourselves in Unisys 1 and disregard the two opinions in the Hecker case from the Seventh Circuit on this in order to reach your position. Is that correct? This Court would need to change its interpretation from what it held in the Unisys case regarding 404c. But in that case, this Court... I thought you argued that Unisys 1 was essentially a dicta. We do argue that it was dicta, but even if it was the holding of the case, because that interpretation... Well, if it's the holding of the case, we can't do anything absent going in bank. Well, because it was the interpretation of ambiguous statutory language that predated the effective date of the Secretary's regulations, it's not controlling in a case like this that is governed by the Secretary's regulations. But if we said in Unisys 1 that the statute was not unambiguous, then we're bound by that, right? This opinion... I'm sorry. Unless we go on bank, I'm sorry. The 1996 Unisys decision did recognize that the statutory text is ambiguous, that the text of 404c neither defines nor clarifies the control a pension plan may permit a beneficiary or participant to exercise. By acknowledging that the statutory text is ambiguous, the Court actually acknowledged the very ambiguity that provides the basis for deference to the Secretary's position under Chevron. Under the Supreme Court's decision in Brandeis, a court's interpretation of statutory language will only control over a subsequent agency interpretation of the same language if the court's construction was mandated by the unambiguous text of the statute. And this court expressly acknowledged that the text of 404c is ambiguous. Well, I'm not sure that it's quite as clear as you've stated it. But so where to look at the preamble on the regulation? Is that where the Secretary derives its rationale? Both the preamble and the regulatory text. In the text, the Secretary provides that fiduciaries will not be held liable for any loss or fiduciary breach that is the direct and necessary result of that participant's exercise. So HECR was just dead wrong in your view? Yes, HECR's analysis of 404c was incorrect. The second HECR case is still wrong? The rehearing decision? In the rehearing decision, the Seventh Circuit made clear that it was not deciding the 404c issue. And more recently in Howell v. Motorola, the Seventh Circuit clarified that it agrees with the Secretary's position that 404c does not immunize fiduciaries for imprudently selecting or monitoring the investment options in the plan. As the Seventh Circuit recognized, the Secretary's interpretation does control the analysis here. Let's go back to Judge Vanaskie's question then. 71 options. One of them is bad, 70 of them are good, and you're telling me that you cannot shield yourself under 404c? Yes, that's what I'm saying. What if you don't choose the one that's bad? That would be a question of whether a participant, for example, who didn't choose one of the bad investments could sue for losses caused by imprudence in selecting other investments. That question is more important. So the person would have to have invested in the bad fund? To recover losses, I would think so. To recover losses associated with that bad fund, that participant would have to be invested in that bad fund. But it's a separate question. And it's only as to that bad fund then that there's not shielding from liability? But if the investors invested in the 70 good funds, then there would be shielding from liability? Yes, as long as the 70 funds were prudently selected as investment options in the plan, the fiduciaries are shielded from liability resulting from participants' selection of those options. Good. Thank you very much, Ms. Vance. Thank you. Mr. Ortelier. May it please the Court. My name is Brian Ortelier. I'm from Morgan Lewis, and I represent the Unisys defendants. By the way, quick housekeeping matter. I'll be splitting some of my time this morning with Mr. Hacker, who represents Fidelity. I'm going to jump right into the ERISA section 404C piece of the argument, the grant of summary judgment to Unisys. Now, both the plaintiffs and the Department of Labor effectively concede that there are no genuine issues of material fact arising on 404C. Their argument is limited to the one legal question that the panel was exploring with counsel. One of the questions I have is, at the outset, why wasn't there negotiations to get either the investor or the advantage classes, which would be cheaper than the retail classes? I think what the Court is pointing to is plaintiff's argument in their brief, and as I think there was a concession made during plaintiff's counsel's presentation, the Spartan Fund. At 10 basis points, the plaintiffs say it's not going to apply. No, I'm talking about the ones, the 64 or so that were retail. By the way, as a general matter, Your Honor, and this is beyond the scope of the record, most Fidelity funds don't have the two levels of institutional versus retail class. And again, we're now getting well beyond the record. So while the argument pertains to some extent to the Spartan Fund, and again, nothing in the complaint or nothing, even the argument in the brief, is not supported by any authority. I thought their argument was that you could have negotiated cheaper rates for the people. You've got $2 billion of investments here, and you could have negotiated cheaper rates. As a general proposition, Your Honor, what the complaint says is that retail mutual funds are imprudent, offered in this context, and that Unisys could have sought these institutional type investments. But again, as the panel has already noted, and as conceded in the district court before Judge Schiller, at least 10 of the investment options were of the sort that plaintiffs say should exclusively populate the lineup. So again, there can never be a finding in the first instance that the entirety of the lineup is imprudent for that reason. And by the way, the Department of Labor, when it issued the new 404C regulations last October, effectively conceded in the Federal Register that they could find, after looking at all the literature and research on this point, they could find no market inefficiencies in pricing. I'm not sure you've answered my question. I'm sorry. If it was possible, if it were determined by the district court as a finding of fact that it was possible to negotiate lower rates, would it have been prudent not to choose the lower rates for the funds? Your Honor, we'll take one step back. The answer is no. There's no imprudence here, nor could there be. And the simple reason is that ERISA Section 404A, the prudent statute, compels a very broad inquiry into what's called like character and like aims. It's set out specifically in the statute. And what that means is that a reviewing court looks at what similarly situated plan sponsors are doing in this marketplace. You look at the large plans. And by the way, the point is conceded. Well, the large plans, I mean, clearly Vanguard is cheaper. Well, but again, you have to avoid sort of or you have to be careful. You can have apples to oranges comparisons. And again, what we did – Well, I mean, Vanguard and Fidelity would probably be apples to apples, wouldn't it? Well, but again, Vanguard, with its insistence really on index fund investing, and by the way, the Department of Labor would never say, nor did they, that somehow active investment management is imprudent. And as we point out in page 44 of our brief, the Department of Labor, in fact, has said in circumstances that they say posits the possibility of a severe conflict, but the DOL has said retail mutual funds are fine, which gets you back to ERISA section 404A, which looks at this. What are the other large plans doing? And what we put into the record, it's publicly available in these form 5500s. These are filings with the Department of Labor. And any plaintiff's lawyer can go look this up. You will not find an allegation that the Unisys lineup materially deviates from what other large plan sponsors are doing here for the simple reason that it's impossible. And by the way, we also put that same information into the record. We offered up a compilation of what other plan sponsors are doing in this space. So again, looking, drilling down on the precise statutory language, there could not be here a sufficiently alleged complaint under Twombly and Iqbal. Now, I just want to comment very briefly. There could not be a sufficiently alleged complaint under Twombly and Iqbal if somebody claims that you could have negotiated, you know, what is it? What's the difference between an institutional rate and a retail rate, roughly, for fidelity? I don't know. They are different, and they vary from fund to fund. So is it as much as 20 basis points, 10 basis points, 30? I'm guessing, Your Honor. I know, again, in the case of the Spartan Fund, it was three one-hundredths of a percent difference. Even there for an index fund, so that's three basis points. So it would seem like for a retail fund, for example, the one that was 121 basis points, the institutional rate probably would be under one or under 100 basis points, right? I don't know, Your Honor, but again, active management costs more, and the DOL says time and time again that there's no particular problem with offering that, and many, many large plan sponsors offer these precisely the same types of investments that Unisys does. And again, under the specific statutory command, that's the sort of thing that's missing from the complaint. Is Unisys some sort of outlier here? The answer has to be no. Consistent with Rule 11, they can't make the allegation that we're doing something differently. And on top of that, again, and I think the panel noted in its discussion with plaintiffs' counsel, in the district court there are at least 10 acceptable alternatives, according to the plaintiffs themselves. They said as much in the brief in opposition. But if you want to be, for example, in an international fund, if you wanted to be, for example, in an international mutual fund, those are usually the higher costs. And, Your Honor, choice is critical here, which is really what 404C. Well, that's what I'm saying. If choice is critical, then if you're at 121 basis points for an international fund, for example, and you could get 20 basis points or 30 basis points less, why isn't there a claim that they have at least for that? Well, again, Your Honor, Unisys offered 70 different investment options, ranging from 10 basis points to 100 basis points. But did any of the index funds allow you to invest outside the U.S.? I don't know. If the S&P 500, the answer is no, right? Agreed. But I think it's important. And further to choice and to this court's ruling in Unisys' savings plan, what we were dealing with was the same statute, the same plan, and precisely the same argument. And what Judge Mansman said, and Judge Sirica, you were on the panel, what Judge Mansman said back in 1996, and again, we've had no change to the statutory language, is that the statute was plain, unqualified, and clear. No, what the court says on page 445 is Section 1104C text, however, neither defines nor clarifies the central element, the, quote, control, close quote, a pension plan may permit a participant or a beneficiary to exercise. Accordingly, we look to legislative history. And the legislative history, which is cited there in the statute, directly supports the conclusion. But that doesn't mean the statute is explicit and plain. They have to go look elsewhere to try to figure out what the statute means. And then since then, the Department of Labor has come in and they've given their regulation with a preamble. I'm not saying it necessarily is entitled to Chevron deference, but why is it entitled to Skidmore deference? Well, you know what, Your Honor? Take a careful look at the DOL's brief. Page 52. I've got it. Well, start with the plaintiff's brief because it's the best exposition of the entirety of the statute. And what the statute says is there is a parenthetical that says that the Department of Labor has authority to speak to control issues. And if you look carefully at the statute, again, it's in the plaintiff's brief, what you'll see is there's another subsection nestled in between that grant, excuse me, of authority to the Department of Labor. Then you have a subsection dropped in there. And then you have discussion of the legal consequences of the exercise of control. But at pages 21 and 22 of the DOL's brief, what have they done? They've taken ellipses and they've jettisoned that intermediate provision, conflated two different statutory subsections, and then argued that the Department of Labor's grant of regulatory authority extends both to the threshold question of control. And by the way, in 1992, out came the regulations. There's no dispute here that UNISYS satisfied the DOL's regulatory regime as it relates to that threshold question of control. But what remains is the legal consequences issue, which if you look at the statute carefully, sits in a slightly different subsection there with intermediate language that the Department of Labor chose to remove from its brief. Where are they wrong in what they say on page 22? It says, under the terms of the act and the Secretary's 404 regulation, planned fiduciaries are shielded only for losses, which result from the participant's exercise of control and not from losses caused by their own fiduciary misconduct. Consequently, 404C does not give fiduciaries a defense to liability for their own imprudence in the selection or monitoring of investment options available under the plan. Well, again, Your Honor, and it sounds that you're not focusing on the statutory language. What I was referring to was the quote. But yes, the regulation. And again, that regulation finally issued. It was part of the preamble to the old regulations last year. And what we're saying, again, Judge Mansman carefully studied. It was precisely the same argument, the same plan, the same statute. But we've had something happen since then. We've had the department finally get around, they say, to moving their view from the preamble to the reg into the text of the reg. But under Brand X Chevron, the statutory language has been determined to be abundantly clear. That ship has sailed in this circuit. Perhaps a court en banc might reconsider that issue. But this is very simple. What kind of deference are we supposed to give to the Department of Labor on this one? I don't think on this issue, given the clarity of the language that Judge Mansman determined in 1996. She just said it wasn't that clear. Well, again, Your Honor, the three sentences, I was involved in the case. We invited Judge Mansman to resolve this question. What happens when you have a breaching fiduciary? Can a breaching fiduciary invoke the protections of 404C? In three successive paragraphs, after looking, by the way, and this is important, 404C simply gives legs to Congress's idea that certain responsibility has to be assumed by participants.  People vote with their feet on this. That's the whole idea. Very, very different from the defined benefit world where if the trust assets, at the end of the day, are insufficient to pay the benefits, the employer's on the hook. Congress wanted to go in a new direction. By the way, we're not talking about an array of Bernie Madoff funds or Bob's pick-em-auto parts. All we're saying and all we're offering these people is a chance to pick as among these varying price alternatives. I heard Plaintiff's Counsel concede there's nothing otherwise wrong with the investment. So we're not sort of confronted with the parade of horribles that might attend. No, what they're saying is you could have negotiated a better deal. But 404C says if you give them options, and again, they conceded in the district court that at least ten of them were reasonable. Judge Mansman says... So, in effect, you're saying you win no matter how we interpret, whether we go along with the Department of Labor or not. Isn't that correct? Well, I certainly do not think the Secretary has room here to offer a contrary interpretation of 404C after Unisys' savings plan. And again, given the fact that the underlying investment, that there are the acceptable alternatives, which is what Judge Mansman looked for back in Unisys 1, we have at least ten, with the Department of Labor saying retail mutual funds are perfect. Let's just think it through logically. If Chevron says you look to the statute and you see if the statute is explicit on the point, if it is, you don't go to step two, correct? Correct. And Unisys 1 says that it's uncertain. I just quoted language on page 445 that says it's uncertain. So, therefore, we go to step two and we go, if we apply Chevron, and we say, okay, is the interpretation given by the Department of Labor reasonable? Isn't that right? And, Your Honor, then the Court turned to, in Unisys, the clear legislative history, which directly supports the interpretation that Judge Mansman gave the statute. And, by the way, as the Court in language ---- You've heard, for example, what Justice Scalia thinks about legislative history. I'm sorry? You've heard what Justice Scalia thinks about legislative history. I have heard that. It's written by staffers for their own bosses and has nothing to do with what Congress really wants. But, Your Honor, what's important here is what is Congress? Back to my earlier point, what's Congress trying to do? Actually, they're trying to shift some responsibility to the participants for their own investments. If this Court were to agree with the Department of Labor, as the Court in Deere said, and the Court in the Fifth Circuit in Langbecker, there'd be nothing left. What's the point of that language in the statute? Again, Congress wanted to create an entirely different milieu for employers. But my point to you is if we just look at it under Chevron, and if our Court in Unisys said that this 404C isn't completely clear, it needs to be clarified, and they looked at legislative history because there was nothing from the Department of Labor at that time, then, in that context, don't you allow the administrative agency to weigh in? I would say no, Your Honor, because it guts the statute. It guts the point what Congress was trying to do here. So you're arguing that what you're really arguing then is that the DOL's position is unreasonable. Well, and again, Your Honor, it extends beyond, frankly, their authority expressly granted in the statute. They can't avoid the fact that the question, as Judge Mansman sees it, was not for the Department of Labor. That's in the statute, and certainly the specific governs the general. They were given authority to speak to control. They invoked it in 1992. It's curious, or something worse, that in 1992 they threw into the preamble to the reg this notion that control does – Isn't there a middle ground? They don't get Chevron deference because they're talking about a preamble that all they can – you can take it under Skidmore deference for whatever it's worth. Well, maybe we could agree to disagree, Your Honor. I think at the end of the day, given – I was throwing you a softball. What's that? Okay, I'll take it. How's that? But at the end of the day, I think the Court needs to keep in mind, you know, what Unisys did here is – we know this. It's in the record, consistent with what all large sponsors did in this space. The Court's inquiry has to look at what's going on there. Plaintiffs concede that there's at least ten acceptable alternatives. The Department of Labor tells us that retail mutual funds are perfectly fine at page 44 in our brief. At the end of the day, these individual participants can move their money around. They vote with their feet. By the way, in that same federal register, the commentary to the new 404C regs, and I'm at 75 Federal Register 64932, the Department of Labor concedes the point. They say you give them information, and the participants will move their money around accordingly. And by the way, over time, the planned sponsor, who wants at the end of the day to have a workforce, there are competitive pressures brought to bear, the employer will jiggle the lineup based on investment allocations. That's exactly what the statute had in mind. Is Mr. Hacker going to speak to the statute of limitations issue? You'll have to ask him, Your Honor. Oh, but you're not – I would ask that the district court be affirmed. Hold on a second. If – Mr. Hacker, are you going to speak to that? I can, Your Honor. It wasn't my intention this morning, but – Okay, that's fine. Then I won't ask Mr. Hacker. So I can go? You can go. Thank you. Good morning. Good morning, Your Honors, and may it please the court. John Hacker with O'Melveny Myers for the Fidelity Entities. The two issues I had intended to address, and I will, of course, address anything the court is interested in, were the fiduciary status of FMTC and the underlying claim of fiduciary breach under ERISA 404A. And I'd like to do those in reverse order, if I could. I'll get to the fiduciary status, which I don't think is terribly controversial, quite frankly. But I do want to address the line of questioning that Judge Ambrose undertook, with the basic – what I understand to be the basic sort of premise being, well, wouldn't it be more prudent to go with the cheaper option when that's available, if the district judge were to find that that's available? And I think there's – the answer is no. And I'd like to – there's sort of two categories of things to consider in reference to that point. First of all, this is not a case that's about an individual fund where there was a particular option that was cheaper. The concession that Mr. Wolfe made this morning, or the statement Mr. Wolfe made this morning, was not about, well, there's a cheaper fund next door that could have been selected in any given category. What he was saying was in every category there was a commingled pool-type option available, a non-mutual fund option available. I thought what he was arguing was there was an institutional rate and a retail rate. And he was wondering why Municis did not negotiate the institutional rate. What he actually said was there was a commingled pool, a completely different type of fund available. Mr. Ortelier correctly said there were not institutional rates available within each fund. He's talking about a completely different kind of investment, which is absolutely critical to understand. This is a generic attack on the use of mutual funds. Is one of the funds here – just to take an example – is one of the funds here the Magellan Fund that you can invest in? I don't think that that one's in the plan currently. Well, let's pick any fund, whatever it is. Yeah, any fund, sure. Is there an institutional rate for that fund? Well, there is – we know of one, the Spartan Fund, that was referenced this morning, where there was the so-called institutional rate, which is 0.07 percent, seven basis points versus 10 basis points. But, again, it's not in the complaint. You wouldn't have six amici here if this was a case about whether the fiduciary should have selected 0.07 versus 0.10. This is about whether mutual funds are an appropriate investment, given – and you heard the argument this morning – given the size of the plan, et cetera, et cetera, they'd negotiate not just a better rate, but a completely different kind of investment. And that's what's so important to understand, is that it's – this is a very different kind of investment, which goes to my second sort of general point in response to the proposition that, well, couldn't isn't always prudent to choose the better option. The law is quite clear. I don't think there's a case to the contrary. There is no duty on the part of a fiduciary to scour the market and look for the cheapest option available, to always pick the cheaper option, particularly with respect to options that are categorically different. What I understood in part there, of the 64 or so retail funds, that Unisys, because it was so big in terms of the amount it was bringing to the table, it could have negotiated a cheaper – or I call it an institutional rate. Is that true? Do you have institutional rates for funds? There are some that I'm aware of. Again, this is outside the record, and it's not the kind of case they were trying to plead. That's what's so important to understand. This is a case about there shouldn't be mutual funds in plans. They should only use commingled pools, those kinds of non-mutual fund options. You don't see in the complaint a detailed attack on a particular fund that says, here's the fund, here's the institutional rate that was available, and here's the reason. And to be clear, even if there were that kind of allegation as to a specific fund, there's still problems with that. There still has to be more than an allegation that the fund was cheaper, because cheaper isn't always better, even within the same fund, because you're talking about a lineup, a menu, a big package of options. And if Unisys had, for example, insisted on the so-called institutional rate within a fund, that would have changed the economics of the deal, and it could have led to a plan cost that's overall higher for the whole plan, even if it's cheaper for that particular fund, because it might be more costly for Fidelity to administer that given fund. So there's a negotiation at every point, which goes to, I think, a fundamental underlying insight of the Hecker case, which is that when you have a broad, diverse lineup, a sufficient mix of options, you can't bring a generalized claim that says, well, you could have found something cheaper out there. If you compare this to Hecker, do you have the range of options that Hecker has? You have something less than was available in Hecker. Well, there's two categories of options in Hecker. There was 23 in the sort of principal funds, and the court at one point refers to that there's a sufficient mix. Then there was another, the brokerage link, but nothing in Hecker turned on the fact that there was the brokerage link. In fact, it referred to the 23 options. Here there's 71, and the DOL, it says, to get the entitlement to the 404C defense, which Fidelity isn't arguing, but I'll just point out that the DOL says three funds are sufficient, so long as there are different types of funds. Here you have 71, and, again, you heard this morning, no allegation that there was a problem. Why shouldn't we take the approach that Braden took? Well, the problem in Braden is that what was going on there was a kickback allegation. I understand that. I understand that, but they had a smaller number of funds. That's right. There was, I think, a smaller menu. Ten? I believe it was just ten. And what the court said in Braden is there's a, you know, the totality of the circumstances where there was only ten funds, and I think critical was the allegation of the kickback, because the point was especially with just ten funds, the idea that there was an unaffiliated company. None of that's going on here, by the way. There's no allegation of revenue sharing in the complaint. The unaffiliated investment provider was said to be basically bribing, buying off the entity in the position of fidelity to include it in the lineup, and especially given that there's only ten funds, that was potentially a real concern. There's no similar concern here with respect to revenue sharing, and with 71 funds there's no basis for saying anything other than what the Hecker court said. There was also an allegation in Braden that seven of the ten funds had underperformed their market indices. Right, and there's no allegation like that here. Again, there's a concession this morning that the funds as investment options were perfectly individually, were prudent options, you know, made sense, and that the lineup reflected the needs, the demographic needs of the employee population. Before you sit down, could you address the revenue sharing argument that was made? I could, and the answer is there is no revenue sharing argument. There's no revenue sharing allegation in the complaint. It doesn't exist. It's not there, and you can't amend a complaint in a motion to dismiss, or obviously in an appellate brief, and you won't find it. You couldn't find it because we're not in the position of the entities involved in, for example, the Braden case. This is a single corporate complex with proprietary funds, so there isn't, there wouldn't be revenue sharing. There's just income to the investment management company, FMR Co. That's just income to the Fidelity Enterprise, and that's all there is to it. The DOL, in the recent interim final regulation, says that it would be artificial to divide up and decide within Fidelity what amount goes to record keeping or other types of work. It's simply income to FMR Co. as the investment advisor. There's no allegation that FMR Co. performed that. Why was the district court wrong on the statute of limitations? The district court was wrong on the statute of limitations we submit because I would say two reasons. First of all, it's already been recognized in this circuit that there's no continuing violation theory for a benefits-type claim. This is a fiduciary claim, and the court hasn't extended that principle to fiduciary claims, but we don't see any basis for distinguishing between the two. And what the district court said is, well, you have an ongoing duty as a fiduciary to monitor performance, et cetera, and we don't disagree with that, but even if you have, or to the extent you have an ongoing duty, what a plaintiff has to allege is that something has changed that warranted a change in conduct outside the 6-year period. This complaint is based on the inclusion, as I've already discussed, of mutual funds in a diverse lineup in 1993. There's no allegation that says in 2002, one of the funds, or any time, one of the funds became wildly imprudent and fell apart totally, was wildly expensive, and therefore should have been pulled out of the lineup. It's simply that mutual funds never should have been in the lineup in the first place. That claim expired after 6 years under what's effectively a statute of repose by ERISA. If there were an allegation, this is what the district court missed, I think, that there is no allegation here that something had changed, a warranting essentially retriggered a statute of limitations. Does the record indicate that there have been no changes in the investment options since 1993? Well, there have been additions. There have been changes, but there's no changes in circumstance. There's no allegation that something changed in 2002 or 2005 that said, well, this option used to be prudent, but now it isn't. If you had that kind of allegation, then yes, there would be essentially a new statute of limitations, but we don't see that here. Good. No other questions? You've set out in the brief your control issue as well. I'm sorry? You've set out the control issue in the brief. Yes, and we think the district court was correct largely for the reasons the district court set. Good. Any other questions? No. Good. Mr. Wolf. Thank you, Mr. Hacker. Mr. Wolf will give you some more time here. Thank you, Your Honor. Judge Amber, I'd just like to clear something up. The institutional alternatives we're talking about broadly is alternatives to retail mutual funds, and the DOL in its 1998 study pointed out that separate accounts provide the same investments at one-fourth the cost of a retail mutual fund. Right. So that's the difference. The Spartan Fund is just one example where we know defendants weren't acting prudently or loyally because there's no justification whatsoever for picking the more expensive version of the exact same mutual fund. Let me ask you just one question, just to start from the back end. On the revenue-sharing part, it was stated by counsel for fidelity that you didn't make that allegation in your complaint. That's incorrect, Your Honor. What they're pointing to is that we didn't use the words revenue-sharing, but what we do talk about is the fact that, and we state it repeatedly, that they set aside a certain amount of their mutual fund fees for paying record-keeping compensation, that they give rebates to plans on that record-keeping portion of the mutual fund fees if asked, that the defendants didn't ask for it. Those are asset-based fees for record-keeping services that don't vary by the size of the assets and, therefore, are subject to ballooning when record-keeping services don't increase at all. All of those allegations are in the complaint. In paragraph 55 of the second amended complaint, subparts B through J. Once one fidelity entity gets the money in and it decides thereafter to share it with another fidelity entity, what do you care? Because, Your Honor, that amount of the mutual fund fee that each participant is paying out of their investments every year provides zero value to that participant. There's no point in the participant paying that amount. If the participant were in charge. Isn't it a wash? I mean, the charge is made. Fidelity entity gets it in, shares it with another fidelity entity thereafter. That's none of your business, is it? Well, it is, Your Honor, because if you choose mutual funds that don't have that system built in, they're going to be cheaper but provide the same investment services. If you go to Fidelity and say, can we get a rebate on that because we're a $2 billion plan and we've actually negotiated a $150,000 fee, Fidelity will say, okay, here you go, and it goes back into the plan. If the fiduciary is acting loyally to the participants in their best interest, then they recover all of that money, which in this case is $6 million each year, and the participants end up paying not a retail mutual fund fee. Now, Fidelity says, well, we don't have institutional class shares in each of our retail mutual funds, and that's true during the time in suit. On a number of them they did, but on a number of them they don't. Other mutual funds do, recognizing that large plans should get better rates. Why did defendants not consider those? Well, we don't even know if defendants considered those, because what they did is all behind closed doors. It's a black box, as Braden points out. We have no idea what, if any, process they went through. So the question is, have we alleged enough to get to the point where we can see, how did they make their decision? When you say that Fidelity also has a fiduciary status, that's one of your arguments, right? Yes. If Unisys has at least three options, it could negotiate with Fidelity to add other options to the existing trust. It could start an additional trust fund. It could walk away. Why aren't those options enough to render what you call Fidelity's veto power illusory? Well, those are enough to have Fidelity avoid being put in a situation it doesn't want to be put in. But the thing is, is that Section 5B of the trust agreement? Well, clearly, if you're Fidelity, you don't want to be called a fiduciary. If you don't think you want to be, if there's a chance you're not going to be. There's additional responsibilities, et cetera. But in this situation, how is Fidelity a fiduciary? Because in addition to just saying we have to sign an agreement for any changes to the plan, they said you cannot add anything without our prior consent. And that's something completely different than just we have to sign the trust agreement. They could not add? They could not add any? For being administered by Fidelity or outside of the administration? True, Your Honor. But the administration is forwarding prospectuses, checking off the accounts in the big spreadsheet that they're maintaining, and taking telephone calls. Really, what Fidelity is trying to preserve is that they're going to get money out of the mutual funds, out of the mutual fund fees that the participants are paying. Now, that's our allegation. I mean, we don't. We haven't proved the case because we're only at the pleading stage. But we believe that's why that's in there, and that may be why we have 71 investment options that are all from Fidelity. When it seems difficult to believe that if a fiduciary looked at every single 71 different options and actually applied a prudent process to determine which is the best for the participants, they would say each of the 71 times Fidelity's got the best one. Anything else you want to tell us? Your Honor, just on the 404C argument, this Court in Unisys 1 did recognize that, did not say exclusively that it will apply in this case. Because there, participants invested in Executive Life GICs, and the question was, does 404C apply there? The Court said, we don't know because there are not enough facts. Importantly, we need to know, did they have alternatives to that specific investment option? And two, did they know enough about what was wrong with the GICs to make that decision? The Court focused on the fact that it's only a 404C issue if the participant's action causes the breach. So the example in the legislative history, the participant says, put all of my money into this high-yield bond fund even though I'm about to retire in a year, completely imprudent, over-allocating, bad decision. But if the fiduciary follows that instruction, the fiduciary's liable for a breach of imprudence and also is a co-fiduciary. Both actions occur at the same time. That's different from the selection of investment options where the fiduciaries have acted before any participant has acted. As soon as they pick an imprudent fund, it's imprudent and a breach of a risk. They are liable to have that removed, to have themselves removed. Before any participant action comes into play. So that's where, in this particular case, the control issue comes in. And that's why the Fourth and the Seventh Circuits upheld that 404C does not apply to that kind of selection of investment options. If that selection was imprudent, 404C can't apply because participants don't choose what investment options are included in their plan. Anything else? Good. Mr. Wolf, thank you very much. The case was very well briefed and very well argued. Thank you. I take the matter under advisement. Thank you, Your Honor.